UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN-SOUTHERN DIVISION

DEAN ANSEL,                                        Case No.:
An individual,                                     Hon.

    Plaintiff,

v.


ERIE TOWNSHIP,

    Defendant.
_____/
Eric I. Frankie (P47232)
Attorney for Plaintiff
535 Griswold St., Suite 111-542
Detroit, MI 48226
(248) 219-9205
ericfrankie26@yahoo.com
_____/

**COMPLAINT AND JURY DEMAND**

Plaintiff Dean Ansel ("Plaintiff"), by and through his attorney, Eric I. Frankie, states for his Complaint and Jury Demand as follows:

**I. JURISDICTION, VENUE AND PARTIES.**

1. Plaintiff is a citizen of the United States and a resident of Temperance, Michigan, within the Eastern District of Michigan.

1

2. Defendant Erie Township ("Defendant") is a State of Michigan municipal corporation duly constituted under MCL §41.2, within the Eastern District of Michigan.

3. The jurisdiction of this Court is invoked pursuant to 28 USC §§1331, 1343(a)(3), 1343(a)(4), 1345 and 42 U.S.C. §2000e-5f.

4. Venue lies in the Eastern District of Michigan, pursuant to 28 U.S.C. §1391(b).

## II. STATEMENT OF FACTS.

5. Plaintiff is a 58 year old individual (DOB: 2/22/64) with the qualifying disabilities of right shoulder rotator cuff tear and degenerative disc disease of the back.

6. Plaintiff was hired as a police officer by Defendant on April 11, 2007. Plaintiff was promoted to police sergeant by Defendant in 2011. Plaintiff was then promoted to the position of Defendant's Chief of Police on February 11, 2014. Plaintiff held the position as Defendant's Chief of Police until he was illegally terminated on July 13, 2021.

7. On January 3, 2020, Defendant's Deputy Supervisor Mike Grodi ("Grodi") told Plaintff "what's wrong old man, the holidays too much for you? You're just too old for this job, taking all these sick days; you're starting to show your age."

2

8. On February 26, 2020, Defendant's Board Member Gary Wilmoth ("Wilmoth") told Plaintiff, while speaking about the problem of Defendant's younger police officers circumventing Plaintiff and going straight to Defendant's Board concerning departmental issues, "you're an old dog in a young dog's fight."

9. On March 19, 2020, during a job performance meeting, Defendant's agents insinuated that Plaintiff was "old fashioned" and that he had to start "thinking outside the box."

10. On June 8, 2020 during a meeting with Wilmoth about the problem of circumventing, Plaintiff stated that he hadn't had the opportunity to tell his side to Defendant's Board. Wilmoth replied that Grodi, along with the rest of Defendant's Board, wanted Plaintiff fired. When Plaintiff asked Wilmoth why they wanted him fired, Wilmoth said "I don't know, I'll have to check with the girls."

11. On June 8, 2020, when Plaintiff asked Grodi about Wilomth's remarks, Grodi told Plaintiff "I don't want you at this point in your career, so close to the end to collecting your retirement, to lose it." Grodi also stated "I want you to retire Dean. I want you to get the pension you've earned. There is a Tsunami okay, a wave against you right now and I think you feel it." While talking to Plaintiff about retirement and Defendant's retirement program, Grodi specifically asked Plaintiff his age. Grodi remarked that he knows that Plaintiff has 17 years that he could have bought from his police service at Luna Pier. Grodi advised

3

Plaintiff that "we are 116% funding" and told Plaintiff that he is the only one who will draw from it. Plaintiff replied to Grodi that he can't retire and that he has to work at least 4 more years. While Grodi was talking to Plaintiff about retirement, Plaintiff noticed a MERS retirement folder on the top of Grodi's desk.

12. On June 10, 2020, Plaintiff was notified by Defendant's Clerk Kimberly Cousino ("Cousino") that the paper she ordered for his office arrived. While carrying the box of copier paper, which weighed approximately 40 lbs., from upstairs to the basement, Plaintiff tripped and missed the last step to the first landing and fell up against the wall with his right shoulder, thereby wrenching his shoulder and back. Plaintiff immediately notified Cousino of the injury.

13. On June 11, 2020, Plaintiff notified Cousino that he would not be into work due to back and right shoulder pain.

14. On June 15, 2020, Plaintiff returned to work and notified Cousino that he needed to see a physician because of his work related injuries. Cousino didn't have a doctor on record to send Plaintiff to. Cousino advised Plaintiff that he could see his family doctor. Plaintiff filled out Defendant's workers' compensation forms and returned them to Cousino. Plaintiff was only able to work until 2:30 p.m. that day because of back and right shoulder pain. Plaintiff made an appointment with his family doctor for June 18, 2020.

4

15. On June 17, 2020, Grodi contacted Plaintiff and told him that he (Grodi) had placed a call to Defendant' retirement carrier (i.e., MERS) checking to see if Plaintiff had sufficient time to retire. Grodi also said that after speaking with MERS he discovered that Plaintiff was eligible for Act 88 service credit which would give him time and make Plaintiff eligible to retire today if he "wanted to." Grodi emailed Plaintiff the forms that Grodi requested from MERS and advised Plaintiff that he needed to fill out the forms in order to apply for Act 88 service credit. Grodi sent Plaintiff the name and phone number of the MERS representative, John Waugh ("Waugh"), that (Grodi) had contacted.

16. On June 17, 2020, as a result of Grodi's call, Plaintiff contacted MERS representative Waugh, with whom he had never previously spoken. Waugh confirmed that he had been contacted by Grodi who was inquiring about Plaintiff's retirement. Waugh told Plaintiff how the Act 88 service credit would apply to him. Waugh gave a brief explanation of how the retirement program worked. Towards the end of their conversation, Waugh made the comment that if Plaintiff was thinking about applying for a "disability retirement" it would change the benefits. Plaintiff did not know how to respond to this comment about "disability retirement" because he had never considered that previously.

17. On June 18, 2020, Plaintiff's family doctor's office took him off of work for 30 days.

5

18. On June 22, 2020, Wade Morrow ("Morrow"), Defendant's Meadowbrook workers' comp adjuster, contacted Plaintiff and asked him several questions about the June 10, 2020 accident. Morrow told Plaintiff that he spoke with Defendant and told them to find a workers' comp doctor.

19. On July 8, 2020, Plaintiff had his first visit with Dr. Brue, a workers' compensation doctor at St. Charles Occupational Health Care Clinic. Dr. Brue ordered an MRI and physical therapy. Dr. Brue also placed Plaintiff on restrictions.

20. On July 9, 2020, Morrow advised Plaintiff that his workers' compensation case was being disputed. Morrow told Plaintiff that there were allegedly some questions between his family doctor's report and the worker's compensation doctor's report. Morrow directed Plaintiff to call Defendant due to the way his case "has been going." Morrow then told Plaintiff that he was not authorizing the MRI or physical therapy prescribed by Dr. Brue. When Plaintiff asked what he was supposed to do, Morrow told him to see any doctor that he wanted but that workers' comp wasn't going to pay for it.

21. On July 9, 2020, Plaintiff notified Cousino that Morrow told him his workers' compensation case was now in dispute and asked what Defendant wanted him to do about coming back to work.

22. On July 10, 2020, Cousino replied to Plaintiff that she was waiting for a response from Morrow about Plaintiff's return to work. Cousino contacted Plaintiff again that day and advised him that he had to get a release form his physician to come back to work after she had discussed the matter with Morrow and Defendant's attorney Phil Goldsmith ("Goldsmith").

23. On July 15, 2020, Plaintiff had a consultation with his family doctor and told him that he was advised by Cousino, Goldsmith and Morrow that he had to get a release to return back to work. When the doctor learned that Defendant's workers' comp was disputing the accident and that no one had treated Plaintiff for his right shoulder and back injuries, he referred Plaintiff to a neurosurgeon and kept Plaintiff off of work until Plaintiff could see him on July 27, 2020.

24. On July 16, 2020, Cousino advised Plaintiff that she wasn't aware of any short term disability that Defendant offered. Plaintiff confirmed with Cousino that Morrow wasn't authorizing him to see any doctors at that point and asked her for clarification on her prior email that Plaintiff get a work release from a physician.

25. On July 17, 2020, Plaintiff received Morrow's letter scheduling him for IME with Dr. Emmanuel Obianwu on August 28, 2020.

26. On July 27, 2020, the neurosurgeon scheduled an MRI for Plaintiff's back and extended his time off of work until August 24, 2020.

27. On August 28, 2020, Dr. Obianwu did not show for the IME with Plaintiff. Morrow told Plaintiff that as of "today's date" his case was being authorized. Morrow acknowledged that Plaintiff's case had "gone on way too long." Morrow told Plaintiff that he was authorizing treatment for his back strain injury "which is covered."

28. On September 1, 2020, Plaintiff scheduled an appointment with Dr. Brue for September 14, 2020 at St. Charles Hospital. St. Charles received an "ok" from Morrow to go ahead with Plaintiff's treatment. However, Morrow then notified Plaintiff that he found an IME doctor in Lansing who could see Plaintiff on September 14, 2020.

29. On September 3, 2020, Morrow told Plaintiff to reschedule his appointment with Dr. Brue at St. Charles Occupational Health on September 14, 2020, because he was not rescheduling the IME set for the same date.

30. On September 14, 2020, Plaintiff was advised by his FOIA attorney Tina Mullins ("Mullins") that Goldsmith had contacted her and wanted to know what Plaintiff's "intentions" were in reference to continued work for Defendant. According to Mullins, Goldsmith stated that Plaintiff was eligible for "disability retirement" through MERS. Goldsmith also advised Mullins that under his condition Plaintiff was qualified for 20 years of service. Goldsmith asked Mullins for a copy of Plaintiff's body cam footage showing the slip and fall accident at

8

work on June 10, 2020. Mullins told Goldsmith that she didn't feel comfortable talking about Plaintiff to him and that Goldsmith should put any request he had in writing. When Goldsmith followed-up with an email he purposefully omitted any reference to "disability retirement" or "body cam" footage.

31. On September 14, 2020, Plaintiff saw IME Dr. Kenton Waterbrook.

32. On September 25, 2020, Mullins notified Plaintiff that Goldsmith was requesting, once again, that she tell Plaintiff he was eligible for "disability retirement" through Defendant's retirement plan with MERS. Goldsmith also requested that Mullins ask Plaintiff if he minded if he or someone from Defendant give "John from MERS" Plaintiff's phone number so they could call Plaintiff to explain what he would have to do for a disability retirement. Mullins asked Goldsmith if Plaintiff could still work in the capacity of police officer if he went on a disability retirement. Goldsmith told her he didn't know and that that would be a "question for John at MERS."

33. On October 1, 2020, Defendant's Supervisor Bill Frey ("Frey"), told Plaintiff "you're too old for this job" and "all these new kids want you gone."

34. On October 10, 2020, Plaintiff received a Notice of Dispute of his workers' compensation case with Dr. Waterbrook's September 14, 2020 report.

35. On October 27, 2020, Plaintiff made a plea to Defendant's workers' comp carrier Meadowbrook to cover treatment for his right shoulder injuries which he had not previously received.

36. On October 30, 2020, Plaintiff received confirmation from Morrow that he was reopening his case. Morrow told Plaintiff that he was only receiving medical assistance on his right shoulder and that he would not get any assistance with his back injury due to Dr. Waterbrook's September 14, 2020 IME. Morrow asked Plaintiff if he was still employed. Plaintiff responded that he did not know and that Morrow would have to contact Defendant.

37. On November 2, 2020, Morrow told Plaintiff that he talked to Cousino who confirmed Plaintiff was still employed. When Plaintiff discussed returning to work with Morrow, he suggested that Plaintiff see what Defendant wanted him to do. Plaintiff then told Morrow that he already reached out to Cousino who advised it was up to Morrow whether Plaintiff could return to work or not. Morrow said it wasn't up to him, it was up to Defendant, and that he thought Plaintiff was still working under Dr. Brue's restrictions.

38. On December 7, 2020, Plaintiff had his first appointment concerning his shoulder with Dr. Davis. Dr. Davis thought Plaintiff should see a neurosurgeon. Dr. Davis also gave Plaintiff an order for an MRI and physical therapy. Meadowbrook's nurse case manager Heidi Abraham ("Abraham")

attended the appointment with Dr. Davis and agreed that she would find a neurosurgeon.

39. On December 29, 2020, Plaintiff received a letter from Dr. Waterbrook scheduling another IME for January 18, 2021.

40. On January 5, 2021, Plaintiff received a notice in the mail from Morrow advising him of Dr. Waterbrook's January 18, 2021 IME.

41. On January 11, 2021, Plaintiff scheduled an appointment with neurosurgeon Dr. Andreshak for February 23, 2021.

42. On January 18, 2021, Plaintiff attended IME with Dr. Waterbrook for right shoulder inury.

43. On February 2, 2021, Morrow advised Plaintiff that his workers' comp case was being closed once again due to Dr. Waterbrook's IME. Plaintiff notified Cousino that Meadowbrook had closed his case and advised her that Morrow said he had nothing to do with Plaintiff's return to work. Plaintiff asked input from Cousino as to what direction Defendant would have him take. Cousino never responded to Plaintiff's question.

44. On March 1, 2021, Plaintiff filed his application for workers' compensation benefits.

45. On May 6, 2021, after an MRI was done, Dr. Davis advised Plaintiff that he did have a right shoulder rotator cuff tear.

11

46. On June 17, 2021, at a meeting of Defendant's Personnel Committee, which consisted of Wilmoth & Defendant's Trustee Paul Perry, Goldsmith read off a typed 2 page letter to Plaintiff of several alleged policy violations that he claimed Defendant's interim Police Chief Dave Meyer brought to their attention. All of the events Goldsmith referenced took place before Plaintiff's work related injury on June 10, 2020 and the commencement of his leave of absence resulting from those injuries.

47. On July 5, 2021, Dr. Andreshak performed right carpal tunnel surgery on Plaintiff.

48. On July 13, 2021, Defendant's Board terminated Plaintiff without any meaningful opportunity to be heard before the decision was made even though Plaintiff brought an attorney with him to the Board meeting at Goldsmith's invitation. When asked the reason for Plaintiff's termination, Goldsmith stated he was fired because he was an "at will employee" and could be fired without reason. Defendant's stated reason for Plaintiff's termination was a mere pre-text for discrimination.

49. Plaintiff filed Charges of Discrimination with the E.E.O.C., Case Nos.: C23A-2020-0079C and 23A-2021-00590C. Plaintiff has requested a right to sue letter. On March 16, 2022, the State of Michigan Civil Rights Department mailed

its Notice of Disposition and Order of Dismissal of Plaintiff's Charges of Discrimination. As a result, Plaintiff has exhausted his administrative remedies.

### III. COUNT I- VIOLATION OF PROCEDURAL DUE PROCESS.

50. Plaintiff reincorporates herein by reference all preceding paragraphs as if fully set forth herein.

51. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits Defendant from depriving Plaintiff of his constitutionally protected property interest in continued employment as Defendant's Chief of Police absent an adequate pre-termination hearing under color of State law. 42 U.S.C. §1983 allows Plaintiff to bring a civil action for damages against Defendant for deprivation of his rights to procedural due process.

52. On July 13, 2021, Defendant violated Plaintiff's constitutionally protected property interest in continued employment as Defendant's Chief of Police because he was not afforded adequate pre-termination hearing by Defendant's Board before the decision was made to terminated him.

### IV. COUNT II-VIOLATIONS OF ADEA AND MCRA.

53. Plaintiff reincorporates herein by reference all preceding paragraphs as if fully set forth herein.

54. Defendant has discriminated against Plaintiff on the basis of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq., by

among other ways, subjecting him to adverse employment actions including termination because of his age.

55. Defendant has also retaliated against Plaintiff for opposing actions that are unlawful under the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq., by, among other ways, terminating him.

56. Defendant has also discriminated against Plaintiff on the basis of his age in violation of the Michigan Civil Rights Act, MCL §37.2101 et seq., by, among other ways, subjecting Plaintiff to adverse employment actions, including termination, because of this age.

57. Defendant has also retaliated against Plaintiff for engaging in conduct that violates the Michigan Civil Rights Act, MCL §37.2101 et seq., by, among other ways, terminating him.

## V. COUNT III-VIOLATIONS OF ADA AND PWDCRA.

58. Plaintiff reincorporates by reference all preceding paragraphs as if set forth fully herein.

59. Defendant has violated he Americans with Disability Act of 1990, 42 U.S.C. §12101 et seq., by failing to accommodate Plaintiff because of his qualifying disability and by discriminating against him because of that disability.

60. Defendant has retaliated against Plaintiff for engaging in protected activities under the ADA by, among other ways, terminating him.

61. Defendant has also violated the Michigan Persons with Disability Civil Rights Act, MCL §37.1101 et seq., by failing to accommodate Plaintiff because of his qualifying disability and by discriminating against Plaintiff because of that disability.

62. Defendant has retaliated against Plaintiff for engaging in protected activities under the PWDCRA by, among other ways, terminating him.

### VI. COUNT IV-WORKERS' COMPENSATION RETALIATION.

63. Plaintiff reincorporates by reference all preceding paragraphs as if fully set forth herein.

64. Plaintiff has requested that Defendant grant him benefits under the Michigan Workers' Disability Compensation Act.

65. In retaliation for Plaintiff's requests for benefits under the WDCA, Defendant has discriminated against him.

66. MCL §418.301(13) prohibits Defendant from discriminating against Plaintiff and terminating him for exercising his rights under the WDCA.

### VII. RELIEF REQUESTED.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant judgment against Defendant for the following relief:

1. An award to Plaintiff of back pay and front pay for damages for lost earnings in the amount he would have earned, with interest, from the date that he last worked and continuing;

2. An award to Plaintiff of compensatory damages sufficient to compensate him for his mental anguish and emotional distress, loss of health, embarrassment and humiliation, and damage to his professional reputation as a result of Defendant's actions;

3. An award to Plaintiff of punitive damages against Defendant as a result of the reckless indifference with which Defendant violated Plaintiff's right to due process of law;

4. An award to Plaintiff of the costs and disbursements of this action, including reasonable attorney's fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 USC 1988(b) in addition to all of the applicable statutes referred to in Plaintiff's Complaint; and

5. An award to Plaintiff of such other and additional legal and/or equitable relief to which he may be entitled.

### VIII. DEMAND FOR JURY TRIAL.

Plaintiff Dean Ansel by and through his attorney, Eric I. Frankie, hereby demands a Trial by Jury in the above-entitled action on any of his claims so triable or as the Court directs.

Respectfully submitted,

Dated: May 23, 202    By:    s/Eric I. Frankie
                                        Eric I. Frankie (P47232)
                                        Attorney for Plaintiff
                                        535 Griswold, Suite 111-542
                                        Detroit, MI 48226
                                        (248) 219-9205
                                        ericfrankie26@yahoo.com