UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEAN ANSEL,

                 Plaintiff,                         Case No. 22-cv-11135

v.                                            Paul D. Borman
                                            United States District Judge

ERIE TOWNSHIP

                 Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 15)

     Plaintiff Dean Ansel was the chief of the Erie Township Police Department from April 11, 2007, until he was terminated on July 13, 2021. Plaintiff Ansel contends that his termination was unlawful, and he filed suit against Defendant Erie Township claiming that his termination: (1) violated his due process rights (2) constituted age discrimination; (3) constituted disability discrimination; and (4) was in retaliation for his workers' compensation claims. Defendant Erie Township rejects Plaintiff's claims and argues that Plaintiff Ansel was lawfully terminated because of his inability to run the police department.

1

Now before this Court is Defendant Erie Township's Motion for Summary Judgement pursuant to Fed. R. Civ. P. 56(a). (ECF No. 15). Defendant argues that there are no genuine issues of material fact, and that Defendant is entitled to judgment as a matter of law against Plaintiff on all four of his claims. This motion has been fully briefed. (ECF Nos. 15, 18, 21). The Court held a hearing on this motion on December 13, 2023.

## I. FACTUAL BACKGROUND

### A. Plaintiff is promoted to chief of the Erie Township Police on an at-will basis.

Plaintiff Dean Ansel began working in Defendant Erie Township's police department in 2007, when he was hired as an officer. (ECF No. 15-2, Deposition of Plaintiff Dean Ansel, PageID.175). In 2011, Plaintiff was promoted to the rank of sergeant. (*Id*. at PageID.179). In 2014, Plaintiff was promoted to police chief. (*Id.* at PageID.183).

Plaintiff's employment as police chief was on an "at-will basis," per the terms of his employment agreement. (ECF No. 15-3, Employment Agreement between Erie Township and Dean Ansel as Chief of Police, PageID.357).

### B. Plaintiff's responsibilities as a "working chief" and the Standard Operating Procedure Manual.

Erie Township maintains a small police force comprising a police chief and a handful of other officers. (ECF No. 15-2, PageID.175). Plaintiff, therefore, acted as a "working chief" with two primary roles. (*Id*. at PageID.234). First, Plaintiff served an administrative function and was "responsible for policy development, control, supervision and program implementation" for the department. (ECF No. 15-3, Duties and Responsibilities of the Erie Township Police Chief, PageID.340). Second, Plaintiff was also required to perform "all regular full-time patrol officer duties as necessary, including patrol, traffic control, responding to calls for service, [and] investigating traffic accidents and criminal offenses" among other things. (*Id.* at PageID.341).

As police chief, Plaintiff, like all officers at the department, was obliged to follow the Police Department Standard Operating Procedure Manual (the "SOP"); a compilation of rules and regulations that govern officer conduct. (ECF No 15-2, PageID.182–83). Upon becoming police chief, Plaintiff signed a form noting that he was "responsible for knowing and understanding all policies and procedures included in [the SOP]." (*Id.* at PageID.183).

## C. 2017–2018: Plaintiff's poor communication skills and his first written reprimand.

Plaintiff's tenure as police chief was marred by his inability to effectively communicate and manage his subordinate officers. On July 6, 2017, Plaintiff

3

responded to an email sent by Officer Cody Carena, in which Carena stated that he completed an excel spreadsheet, by writing: "Good job Cody, way to be Pro-Active and take initiative, a word that Frank [Nadeau] couldn't even spell let alone try to do." (ECF No 15-3, Emails between Plaintiff and other Police Officers, PageID.362) (internal quotation marks omitted). On July 9, 2017, after Officer Frank Nadeau sent an email informing the other officers that he created a complaint book for the department, Plaintiff emailed him back:

> I hate to burst your bubble, but as long as you're on this team it will be called, "The Cream Team" as in "Cream Puff". Furthermore, you're trying to be like Officer Carena, I can appreciate it, but can say this will never happen. Officer Carena is a "Stellar" officer, with an "Excellent" work ethic, both of which you are not, and will never be.

(*Id*. at PageID.363).

On May 16, 2018, Plaintiff was given a written reprimand for misuse of his Erie Township email from Erie County Deputy Supervisor, Mike Grodi, and Township Clerk, Kim Cousino. (ECF No 15-4, Written warning issued to Plaintiff, PageID.366). The reprimand stated that Plaintiff had acted "discourteous[ly] and unprofessional[ly]" during a Bedford Township Board meeting. (*Id*). Plaintiff was also reprimanded for using his Erie Township email "to exchange emails regarding business that does not pertain to the duties of the Erie Township Police Chief, during scheduled working hours." (*Id*).

4

**D. 2019: Meetings about Plaintiff's management ability and comments about his age.**

On March 19, 2019, Plaintiff, Mike Grodi, and Kim Cousino met to discuss, among other things, evaluations of Plaintiff, which township police officers had submitted. (ECF No. 15-4, Memo to the Plaintiff from the Township Personnel Committee regarding the evaluation of the Police Department, PageID.369). In response to the evaluation feedback, the parties discussed "communication, interpersonal relationships, and positive vs. negative reinforcement." (*Id*). Following this meeting, Plaintiff agreed to enroll in an online "course for police chiefs on management," which he never ended up completing. (ECF No. 15-2, PageID.221)

Plaintiff and members of the Erie Township Board appear to agree that part of the reason Plaintiff was having problems managing his subordinates was the age discrepancy between him and them. Plaintiff was 57 years old when he was terminated by defendant (ECF No. 15-2, PageID.171) and most of the officers he oversaw were in their mid-20s. (*Id*. at PageID.224).

For example, on May 10, 2019, Plaintiff was called into a meeting to discuss complaints that had been made about him. At the meeting, Plaintiff, attempting to explain the complaints, stated "[y]ou're teaching an old dog new tricks. That's part of the problem." (*Id*. at PageID.222). And, on October 1, 2019, Erie Township Supervisor Bill Frey told Plaintiff: "[Y]ou're too old for this job and all these new

5

kids want you gone." (ECF No. 18-22, Affidavit of Plaintiff, PageID.1422). Plaintiff also characterized himself as "old school" (ECF No 15-2, PageID.225), while often referring to his officers as "millennials" in an insulting fashion. (ECF No. 15-5, Deposition transcript of Township Clerk Kimberly Cousino, PageID.488).

Plaintiff did not help bridge this age gap by, on October 8, 2019, sending an email to his officers referring to them as "[s]lobs" and "little pigs" for failing to properly clean a coffee machine. (ECF No. 15-3, PageID.364).

### E. January 2020–March 2020: The police department's high turnover and further comments about Plaintiff's age.

Morale at the police department continued to plummet and, by 2020, the police department had lost five officers in two years. (ECF No. 15-2, PageID.232–33). This high turnover rate in such a small police department concerned Township board members. (*Id*).

The comments about Plaintiff's age also continued. On January 3, 2020, Mike Grodi asked Plaintiff "[w]hat's wrong, old man[?] The holiday's too much for you. You're just too old for this job. Taking all these sick days, you're starting to show your age." (*Id*. at PageID.222–23). On February 26, 2020, Gary Wilmoth, the Township Supervisor, told Plaintiff, in response to the younger officers circumventing Plaintiff's authority, that he was "an old dog in a young dog's fight." (*Id*. at PageID.223).

6

On March 19, 2020, Plaintiff was called into a meeting to discuss "scheduling, turnover, and disgruntled employees." (ECF No 15-7, March 24, 2020 – Email from Plaintiff to other Police Officers and March 27, 2020 – email from Police Officer Jason Derwoed to Township Board, PageID.673). A key point of emphasis at the meeting was Plaintiff's shift-scheduling practices. (*Id*). Plaintiff was told that "officers were stressing concerns about the schedule not being done in a timely man[ne]r, working weekends, working different shifts, working set shifts, etc." (*Id*). Plaintiff agreed that he "must do better at getting the schedule out sooner and as advanced as far out as possible." (*Id*. at PageID.674).

Plaintiff also noted that the board suggested he "work weekends instead of letting the guys work weekends." (ECF No. 15-2, PageID.231). Plaintiff, annoyed at this suggestion, said:

> I'm a police officer, the chief of 32 years. To bend over for this new generation, they want the chief to start working weekends so the guys, younger kids don't have to. I don't know about you, but I grew up in a different society.

(*Id*). Plaintiff later admitted that, despite being a "working chief," he only "[o]ccasionally" scheduled himself for weekend shifts when there were "special events" like the Santa parade or the Easter Parade. (*Id*. at PageID.234).

On March 27, 2020, Officer Jason Derwoed, frustrated by the state of the police department, sent an email to the Township board requesting a meeting to

discuss his concerns with Plaintiff's scheduling and other outstanding issues. Derwoed wrote that while he "in no way mean[s] to be disrespectful to [Plaintiff]" he believes that Plaintiff "has difficulty thinking outside the box" and that Derwoed had a "reasonable solution" to the department's issues. (ECF No. 15-7, PageID.672).

On March 29, 2020, Plaintiff responded to this email by rebuking Officer Derwoed for not following the chain of command and insisting that "no meeting with the [b]oard" would take place. (ECF No. 15-8, March 29, 2020 – Email from Plaintiff to Police Officer Derwoed, PageID.677). The Personnel Committee, which had not yet been formed, would later state that Plaintiff's response was "demeaning and unbecoming of a police Chief." (ECF No. 15-8, May 28, 2020 – Directive from the Township Personnel Committee to the Plaintiff, PageID.687).

**F. April 2020–May 2020: The Personnel Committee is created, and Officer Derwoed submits an additional complaint.**

On April 16, 2020, Township Clerk Kim Cousino notified the police department that she and Gary Wilmoth had been appointed to serve on the newly created Personnel Committee, which would handle complaints about the police department. (ECF No. 15-8, April 16, 2020 – Email from Township Board Members to all Police Officers, PageID.680). Moving forward, officers would first seek to resolve their issues by going to Plaintiff directly. (*Id*). If, after going to Plaintiff, an

issue remained unresolved, then officers could bring it to the Personnel Committee. (*Id*).

On May 23, 2020, Officer Derwoed, upset after being reprimanded by Plaintiff for not wearing his body camera during a traffic stop (ECF No. 18-32, Deposition Transcript of Jason Derwoed, PageID.1699–700), filed a written complaint with the Personnel Committee detailing several of Plaintiff's SOP violations. (ECF No. 15-8, May 23, 2020 - Written complaint by Police Officer Jason Derwoed, PageID.682). Derwoed's complaint makes, among others, the following allegations:

- "I believe that Chief Ansel should be charged with Conduct Unbecoming for threatening an employee for following the chain of command and requesting a meeting to resolve an issue that he clearly by his own actions can't resolve and still goes on unresolved."

- "I came to work the following Monday March 30th 2020 and was brought into the Chief's office along with Officer Meyer. The Chief informed me that he had promoted Officer Meyer to the position of Sergeant and that he was my new immediate supervisor. This is a direct violation of the Erie Township Personnel Policy and Procedure Manual."

- "I have never seen Chief Ansel wear a body camera and there is no exemption for the Chief in the Standard Operating Procedure for body camera usage. Chief Ansel violates his own Standard

Operating Procedure daily, as I have never seen him wear a body camera."

- "I believe this write up was retaliation for my requesting the meeting with the board. I haven't received any citizen complaints regarding my Police activity in the Township on the contrary I have received compliments on my professionalism and courtesy."

- "Chief Ansel suspended Officer Nadeau from work which was another direct insubordinate decision in violation of Erie Township Policy & Procedure Manual."

- "Chief Ansel has made a hostile work environment with his blatant disregard for Township Personnel Policy and Procedures as well as his selective enforcement of the Standard Operating Procedure."

(*Id*. at 682–84).

On May 28, 2020, the Personnel Committee sent an email to Plaintiff notifying him that they investigated the allegations made in Derwoed's complaint. (ECF No. 15-8, PageID.687). The committee noted that they "observ[ed] a lack of management and leadership skills" by Plaintiff and stated that "[a] department of two officers and one sergeant should not experience the amount of tension and conflict that ha[d] been brought to the attention of the board recently." (*Id*). The committee explained that it "expect[ed] to see an improvement in [Plaintiff's] communication, leadership, and management skills. . .within a time frame satisfactory to the committee." (*Id*). The committee also stressed that "all township

10

employees, no matter the rank," were expected to follow the SOP. (*Id*. at PageID.688).

Plaintiff later admitted that it was clear to him that the "personnel committee was not pleased with the way [he] [was] running the police department." (ECF No. 15-2, PageID.251).

### G. June 2020–July 2020: Plaintiff's June 10, 2020 fall, his workers' compensation claim, and his medical leave.

On June 4, 2020, the Personnel Committee held a disciplinary meeting with Plaintiff in which it ordered him "to wear a body camera and keep it on [] at all times at work." (ECF No. 18-22, PageID.1422). At this meeting, Wilmoth also told Plaintiff "I don't want to see you fight, you're too old." (*Id*).

On June 7, 2020, Officer Derwoed filed another complaint against Plaintiff with the Personnel Committee. (ECF No. 15-8, Second Complaint to the Police Department Personnel Committee by Police Officer Jason Derwoed, PageID.690). The complaint alleged that Plaintiff violated the Township Personnel Police and Procedure Manual, and committed "Neglect of Duty" by failing to respond to a call about a stolen vehicle for more than three hours while on duty. (*Id*).

On June 8, 2020, Plaintiff had a meeting with Gary Wilmoth, in which Wilmoth told Plaintiff that he could recommend to the board that Plaintiff should be fired and that the board would vote to fire him. (ECF No. 18-22, PageID.1423).

Shortly after this, Plaintiff confronted Board Member Mike Grodi about Wilmoth's remarks and Grodi responded, "I don't want you, at this point in your career, so close to the end to collecting your retirement to lose it" and "I want you to retire, Dean. I want you to get the pension you've earned," but "[t]here is a tsunami . . . against you right now." (*Id*).

On June 9, 2020, at the behest of the Personnel Committee, Grodi sent an email outlining his concerns with Plaintiff's performance as police chief. (ECF No. 15-9, June 9, 2020 – Email from Township Board Member Michael Grodi to Township Personnel Committee regarding the Plaintiff's lack of administrat[iv]e skills and lack of support from other Police Officers, PageID.694). Grodi listed five primary concerns:

- "[Plaintiff's] [s]ignificant lack of administrative skills."

- "[Plaintiff] is not respected by his officers."

- "Inconsistencies in [Plaintiff's] schedule, his officers schedule, and his time sheets."

- "[Plaintiff's] inability to do the job he was hired to do."

- "[Plaintiff's] consistent shaming of the township board during public meetings."

12

(*Id*). Grodi would also later state that part of Plaintiff's issues stemmed from his "inability to deal with or communicate effectively with officers that were younger than him." (ECF 18-10, PageID.1106).

On June 10, 2020, Plaintiff had another meeting with the Personnel Committee to discuss Officer Derwoed's latest complaint. (ECF No. 15-2, PageID.264). Plaintiff was aware, at this point, that "the majority of the board, four out of five wanted [him] fired." (*Id*. at PageID.265).

A few hours after this meeting, Plaintiff fell while walking down the stairs at the police department. (*Id*. at PageID.265–66). Plaintiff fell sideways, hit his shoulder against a cement wall, and immediately felt an intense pain in his lower back and shoulder. (*Id*. at PageID.266–67).

On June 11, 2020, Plaintiff sent a text message to Kim Cousino informing her that his fall was worse than he initially thought and that he would be taking a sick day to allow his body time to heal. (ECF No. 15-9, Text from Plaintiff to Township Clerk Kim Cousino, PageID.699). In that same text message, Plaintiff also remarked that "[i]t's tough getting old." (*Id*. at PageID.700).

On June 17, 2020, Plaintiff submitted a benefits claim with the Michigan Municipal League Workers' Compensation Fund. (ECF No. 15-9, Various Worker's Compensation documents regarding the Plaintiff's Worker's Compensation Claim,

PageID.705). Kim Cousino also filled out and filed the "EMPLOYER'S REPORT OF INJURY" form, which was necessary for the insurance company to process Plaintiff's claim. (ECF No. 15-2, PageID.271).

Plaintiff was treated by several physicians following his injury. Plaintiff was first treated by Dr. Henry Naddaf, M.D., who filled out a work disability statement explaining that Plaintiff was unable to work from the date of his injury until July 20, 2020. (ECF No. 15-10, Plaintiff's treating medical doctors work disability forms, PageID.716). Between this first appointment and February 23, 2021, Plaintiff was examined by four other doctors. (*Id*. at PageID.719–25). Three of those doctors agreed that Plaintiff was completely unable to work during that time. (*Id*).

The fourth doctor, Dr. James Brue, M.D., noted that, as of July 8, 2020, Plaintiff could work limited duty subject to the following restrictions:

> Bending may not be performed. Squatting may not be performed. Twisting may not be performed. Carrying should be limited to 10 pounds or less. Lifting should be limited to 10 pounds or less. Pulling may be performed up to 10 minutes per hour. Standing/Walking/Sitting Allow to change postures as needed. Not able to be in physical confrontations.

(ECF No. 15-10, PageID.718).

On July 9, 2020, Plaintiff wrote in an email to Kim Cousino: "[e]ven under light duty I'm not sure how I could work under the restrictions placed on me by Dr. Brue." (*Id*. at PageID.728). Cousino also informed Plaintiff that the township had no

14

light duty work that would comport with Dr. Brue's restrictions. (ECF No. 15-2, PageID.284).

On July 17, 2020, Plaintiff emailed Cousino stating that his age may have factored into the severity of his injury: "I feel okay if I don't sit or stand too long, or bend, twist, lift or try to do any physical activities. When Gary [Wilmoth] said I was too old for the job, maybe he was right." (ECF No. 15-10, July 16, 2020 – Email from Plaintiff to Township Clerk, PageID.730).

Plaintiff continued to receive workers' compensation benefits until February 2, 2021, when the workers' compensation insurance company discontinued the benefits. (ECF No. 15-2, PageID.298). From the time of Plaintiff's injury through the date of his termination, no physician released Plaintiff to return to fulltime police duty. (*Id*. at PageID.295). Plaintiff also later admitted that he was not physically capable of performing the tasks required of a regular police officer during this time period. (*Id*. at PageID.296).

## H.  August 2020: Sergeant Meyer becomes interim Chief and Officer Derwoed resigns.

In the summer of 2020, since Plaintiff was still unable to work, Defendant appointed Sergeant Dave Meyer to serve as interim Police Chief. (*Id*. at PageID.301). Meyer, who was 67 when he was appointed, is older than Plaintiff. (*Id*).

15

On August 15, 2020, Officer Derwoed submitted his letter of resignation to Sergeant Meyer. (ECF No. 15-11, August 25, 2020 – resignation letter of Police Officer Jason Derwoed, PageID.738). Derwoed's letter explained that he "no longer wish[ed] to continue working here, as [he] found [Plaintiff] extremely difficult to work for." (*Id*). Derwoed also noted that the police department "has a revolving door when it comes to retaining Police Officers," which Derwoed attributed to the "poor leadership" he had seen. (*Id*). Derwoed also stated that if there were a "change in the current leadership of the Police Department" he would "like to return and serve the citizens of Erie Township." (*Id*. at PageID.739).

## I.   February 2021–June 2021: Sergeant Meyer's discovery of misconduct, the Personnel Committee meeting, and Plaintiff's MIOSHA complaint.

On February 25, 2021, Sergeant Meyer, then acting as interim chief, compiled a list of Plaintiff's misconduct that he turned over to Kim Cousino. (ECF No. 15-8, PageID.537). Sergeant Meyer found that Plaintiff violated nine separate SOP guidelines including:

- SOP #41: "[Plaintiff] was using Erie Township owned and department issued body cameras to record conversations, interactions, and meetings with board members and other employees without their knowledge and consent."

- SOP #20, 36, 38: "Meyer found an unsecure box of numerous handguns and bullets that were in [Plaintiff's] office. The guns and ammo was evidence that should have been destroyed."

16

- SOP #36, 38: "Meyer discovered an unloaded gun, 30 rounds of ammo, magazine with black jack, taser, and a knife. There were no labels on the evidence nor was a complaint logged on the property."

- SOP #37: "Meyer found a box of evidence labeled as "to tab" that was never taken to the lab."

- SOP #34: "Multiple boxes of medications that were emptied from the red Med Box were stored in the property room, that should have been transported to the disposal site for destruction."

(ECF No. 15-11, List of discoveries of misconduct by Plaintiff Dean Ansel, PageID.741–42).

Plaintiff later admitted that, had this list been presented to the Township Personnel Committee, it "probably" would have been appropriate for them to investigate him. (ECF No. 15-2, PageID.307). Plaintiff, however, did not believe that it would have been appropriate for the Personnel Committee to recommend that the Board terminate his employment based off this list. (*Id*).

On May 27, 2021, Plaintiff received a letter from Defendant's attorney Philip D. Goldsmith, inviting him to attend a Personnel Committee meeting to discuss Plaintiff's job performance. (ECF No. 15-11, May 26, 2021 – letter from Township Attorney to the Plaintiff inviting Plaintiff to Personnel Committee Meeting, PageID.744).

17

At this meeting, which was held on June 17, 2021, Goldsmith explained to Plaintiff that the Personnel Committee would make recommendations to the Board regarding the future of Plaintiff's employment. (ECF No. 15-11, Transcript of Personnel Committee Meeting with the Plaintiff. June 17, 2021, PageID.747). Goldsmith informed Plaintiff of Plaintiff's specific SOP violations and offered him an opportunity to respond to the allegations. (*Id.* at PageID.747–53). Plaintiff declined to respond, and noted that "[m]ost of it doesn't deserve a response." (*Id.* at PageID.753).

At the end of the meeting, Goldsmith explained that Plaintiff still had a job at this time, but that the issue of his continued employment "could be addressed in the future." (*Id.* at PageID.754).

On June 24, 2021, Plaintiff received a letter inviting him to a meeting at which the Board would consider terminating his employment. (ECF No. 15-12, June 23, 2021 – Letter from Township Attorney to Plaintiff inviting him to Township Board Meeting of July 13, 2021, PageID.759).

On June 30, 2021, before this meeting was held, Plaintiff filed a complaint with the Michigan Occupational Safety and Health Administration ("MIOSHA"). (ECF No. 15-12, Communication from the Michigan Department of Labor, Michigan Occupational Safety and Health Administration, PageID.763). Plaintiff's

complaint alleged that the Erie Township Police Department contained a hazard because the stairway that Plaintiff fell on "ha[d] no spindles" on the railing. (*Id*).

**J. July 2021: The Erie Township Board meeting, Plaintiff's termination, and Plaintiff's replacement.**

On July 13, 2021, the Erie Township Board convened the meeting to discuss Plaintiff's continued employment. (ECF No. 15-12, July 13, 2021 – Erie Township Board Meeting Minutes, PageID.766). At the meeting, Plaintiff was told he could request that the meeting enter closed session to discuss his at-will employment agreement, but Plaintiff preferred to continue in open-session. (*Id.* at PageID.768).

Plaintiff, who came into the meeting equipped with a 27-page report that would "shed some light on all the events that had taken place up until this point" (*Id.* at PageID.328), was not given an opportunity to participate in the meeting or respond to the allegations against him. (ECF No. 18-22, PageID.1425). Plaintiff was, however, allowed to participate in the earlier June 17, 2021 meeting. (ECF No. 15-11, PageID.753).

Ultimately, Plaintiff was terminated by a unanimous vote of the board. (ECF No. 15-12, PageID.768). Plaintiff was replaced as police chief by Tim Ames, who was 59 at the time, and is older than Plaintiff. (No. 15-2, PageID.329).

19

## II. PROCEDURAL BACKGROUND

On May 23, 2022, Plaintiff Dean Ansel initiated this action by filing a Complaint against Defendant Erie Township. (ECF No. 1). Plaintiff's Complaint states four claims for relief, all of which stem from Plaintiff's termination. (*Id*).

Count I alleges that Plaintiff was not afforded an adequate opportunity for hearing before his termination in violation of the due process clause of the Fourteenth Amendment. Count II alleges that Plaintiff was terminated due to his age in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*., and the Michigan Civil Rights Act, MCL § 37.2101 *et seq*. (*Id*). Count III alleges that Plaintiff was terminated because Defendant refused to accommodate Plaintiff's disability in violation of the federal Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., and the Michigan Persons with Disability Civil Rights Act, MCL § 37.1101 *et seq*. (*Id*. at PageID.14). Count IV alleges that Plaintiff was terminated in retaliation of him seeking workers' compensation in violation of the Michigan Workers' Disability Compensation Act, MCL § 418.301(13). (*Id*. at PageID.15).

On July 7, 2022, Defendant filed its Answer to Plaintiff's Complaint in which Defendant denied much of the substance of Plaintiff's allegations as untrue. (ECF No. 3).

On July 5, 2023, after several months of discovery, Defendant filed a Motion for Summary Judgment, which requests this Court to dismiss Plaintiff's Complaint, in its entirety, with prejudice. (ECF No. 15). On September 9, 2023, Plaintiff filed a Response in opposition to Defendant's Motion for Summary Judgment. (ECF No. 18). On October 3, 2023, Defendant filed a Reply in support of its motion. (ECF No. 21).

### III. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010)

(quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## IV. ANALYSIS

### A. Procedural Due Process Claim

Count I of Plaintiff's Complaint alleges that he was terminated as police chief

without adequate pre-termination hearing in violation of the due process clause of

the Fourteenth Amendment. (ECF No. 1, PageID.13). Plaintiff brings suit for this

due process violation under 42 U.S.C. § 1983. (*Id*). Defendant moves for summary

judgment on this claim.

The due process clause of the Fourteenth Amendment "includes a guarantee

of procedural fairness, assuring that a deprivation of life, liberty, or property must

be preceded by notice and opportunity for a hearing appropriate to the nature of the

case." *Blazy v. Jefferson Cnty. Reg'l Plan. Comm'n*, 438 F. App'x 408, 411 (6th Cir.

2011) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, (1985))

(internal quotation mark omitted). Courts use a two-step process to analyze

procedural due process claims. *Id.* First, the court must determine whether the

plaintiff has "establish[ed] that he had a protected property interest in his continued

employment entitling him to due process protection. *Id*. at 411–12. Second, "if the

23

plaintiff has such a protected property interest, th[e] court must then determine what process is due" and whether that process was given. *Id*. at 412.

Defendant argues that Plaintiff's procedural due process claim fails as a matter of law because it does not satisfy either step of this analysis. (ECF No. 15, PageID.147–48). Defendant further argues that even if Plaintiff's claim satisfied both steps, Plaintiff's claim would still fail because he has not identified a municipal policy, which caused this due process violation, as required for claims against municipalities under *Monell v. Dept. of Soc. Servs. City of New York*, 436 U.S. 658 (1978). (ECF No. 15, PageID.148).

### i. Plaintiff did not have a protected property interest in his continued employment as police chief.

Defendant is entitled to summary judgment in its favor because Plaintiff did not have a protected property interest in his employment as police chief.

The parties agree that whether Plaintiff had a protected interest in his employment is a question of Michigan state law. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (a protected property interest is not created by the Constitution; rather, it is created "by existing rules or understandings that stem from an independent source such as state law").

Under Michigan law, a public employee "does not have a property interest in continued employment when the position is held at the will of the employee's

superiors and the employee has not been promised termination for just cause only."

*James v. City of Burton*, 221 Mich. App. 130, 134 (1997). Generally, Michigan law

"presumes that employment relationships are "at-will" arrangements." *Pucci v.*

*Nineteenth Dist. Ct.*, 628 F.3d 752, 766 (6th Cir. 2010) (citing *Lytle v. Malady,* 579

N.W.2d 906, 910–11 (1998)). Parties can defeat this presumption of at-will

employment in one of three ways:

> (1) proof of a contractual provision for a definite term of employment
> or a provision forbidding discharge absent just cause; (2) an express
> agreement, either written or oral, regarding job security that is clear and
> unequivocal; or (3) a contractual provision, implied at law, where an
> employer's policies and procedures instill a legitimate expectation of
> job security in the employee.

*Id* (quoting *Lytle*, 579 N.W.2d at 911).

Plaintiff's employment agreement states explicitly that the "Employment of

Employee shall be on an at-will basis." (ECF No. 15-3, PageID.357). Plaintiff signed

this employment agreement and later admitted that he understood and agreed that

his employment was on an at-will basis. (ECF No. 15-2, PageID.188–89).

Despite acknowledging this provision, Plaintiff maintains that he "has

presented sufficient material evidence of a contract for a definite term of

employment which . . . instilled in him a legitimate expectation of job security."

(ECF No. 18, PageID.815). To support this position, Plaintiff cites to *Pucci v.*

*Nineteenth Dist. Ct.*, 628 F.3d 752 (6th Cir. 2010).

25

There, a former administrative employee at Michigan's Nineteenth District Court brought suit against the court's chief judge after she was terminated from her position. *Id.* at 755. In arguing that she was not an at-will employee, the plaintiff highlighted the following evidence:

> **[She] never signed the "at-will" employment agreement that some other court employees signed.** She claim[ed] that the Nineteenth District Court, which ha[d] no employment manual or policies, ha[d] in practice followed those of the City of Dearborn. [She] also note[d] Dearborn's "progressive" employment policies and two prior incidents in which court employees were terminated and given generous severance packages in exchange for signing waivers of their respective employment rights.

*Id*. at 758 (emphasis added).

On appeal, the Sixth Circuit found that this evidence "indicat[ed] the Michigan court system voluntarily adopted protocols and procedures that instilled in [the plaintiff] a valid expectation of continued employment under Michigan state law" sufficient to create a property interest under the Fourteenth Amendment due process clause. *Id*. at 766.

Plaintiff argues that a similar expectation of continued employment was created by Defendant here. Plaintiff notes that at a June 17, 2021, Personnel Committee meeting, called to address Plaintiff's violations of the police department's SOP, attorney Phil Goldsmith assured Plaintiff that he still had a job and that any decision to terminate him would have to be made by the full board, per

26

the terms of his employment contract. (ECF No. 15-11, Transcript of Personnel Committee Meeting with Plaintiff, PageID.747, 754).

Further, in his deposition, Mike Grodi, Deputy Supervisor of Erie Township, admitted that historically, someone in Plaintiff's position would have been "given an opportunity in open or closed session at their discretion to be able to discuss and present their facts for the case" before being terminated. (ECF No. 18-10, Deposition of Mike Grodi, PageID.1084–85).

The Court does not find that these assurances were sufficient to create either "an express agreement . . . regarding job security that is clear and unequivocal" or "a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee." *Pucci*, 628 F.3d at 766. Unlike the plaintiff in *Pucci*, Plaintiff Ansel had an employment agreement with an explicit at-will provision. (ECF No. 15-3, PageID.357). This agreement specifically stated that the at-will nature of Plaintiff's employment could not be altered by "any contrary statements or provisions which might be made verbally or which might appear in any other form, manuals, handbook or other documents." (*Id*). Plaintiff signed this agreement and later acknowledged that he understood his employment to be strictly at-will. (ECF No. 15-2, PageID.188–89).

27

Given this, the statements made by Goldsmith and Grodi did not create a property interest in Plaintiff's continued employment sufficient to sustain a procedural due process claim against Defendant.

### ii. Plaintiff was given adequate pre-termination process.

If a court determines that a party had a protected interest in their continued employment, the court must then determine what process is due before that party may be terminated. "Although the existence of a property interest is defined by state law, the procedures that must be followed in depriving an individual of that property interest are defined by the federal Constitution." *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006). When a public employee has a property interest in their continued employment, due process requires "a pretermination opportunity to respond, coupled with post-termination administrative procedures." *Id.* (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547–48 (1985)).

Plaintiff's procedural due process claim also fails because he was provided a pre-termination opportunity to respond and because he never requested any post-termination administrative procedures.

Plaintiff was given adequate pre-termination opportunity to respond to the allegations against him. Plaintiff attended a Township Personnel Committee meeting on June 17, 2021. (ECF No. 15-11, PageID.747). This meeting was held to address

concerns about Plaintiff violating the police department SOP before he went on medical leave. (*Id*). At the start of the meeting, Plaintiff was notified that while all employment decisions would be made by the full board, "[t]he committee makes recommendations to the full board" regarding those employment decisions. (*Id*). Plaintiff was told that he could choose to respond to any of the allegations made and that he was entitled to have an attorney present at the meeting. (*Id*). Committee members proceeded to list some of Plaintiff's alleged SOP violations, but Plaintiff declined to respond to these allegations. Plaintiff stated that "most of [the allegations] do[]n't deserve a response." (*Id*. at PageID.753).

On June 23, 2021, attorney Goldsmith delivered a letter to Plaintiff inviting him to attend a Board of Trustees meeting on July 13, 2021, which would "consider the termination of [Plaintiff's] Employment Agreement with Erie Township." (ECF No. 15-12, PageID.760). Plaintiff was advised that the meeting could be considered in a closed session and that he would be permitted to have legal counsel present. (*Id*).

Despite this, though, Plaintiff claims he was not given adequate opportunity for pre-termination hearing because:

> I came [to the July 13, 2021 meeting] prepared with a 27-page report that I was prepared to read to the board that would shed some light on all the events that had taken place up until this point now. I think if they

would have heard me out, I don't think the decision to fire me would have been made.

(ECF No. 15-2, PageID.328).

Plaintiff's claim that he was not allowed to read his 27-page report at the meeting does not create a genuine issue of material fact. *Silberstein* requires that public employees with a protected property interest be given a pre-termination hearing to satisfy procedural due process. *Silberstein* does not require employers to give that pre-termination hearing in a manner and at a time decided by the employee.

Defendant satisfied its procedural due process obligations by allowing Plaintiff the opportunity to respond to the allegations against him at the June 17, 2021 meeting. Plaintiff declined to do so, and Defendant was not required to furnish further opportunity for him to respond at the July 13, 2021, meeting.

Lastly, the Court notes briefly that under *Silberstein*, to satisfy the requirements of procedural due process, an employer must also offer post-termination administrative procedures. *Silberstein*, 440 F.3d at 315. Here, the record does not indicate that Plaintiff sought any post-termination procedure that was denied by Defendant, so this second requirement is inapplicable.

### iii. Plaintiff has not established that Defendant had a municipal policy of violating due process rights.

30

A municipality, like Defendant Erie Township, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. A municipality is only liable if the plaintiff's civil rights were violated as a direct result of that municipalities policy or custom. *Id*. There are four ways of establishing a municipal policy or custom:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiff's procedural due process claim fails because he has not identified a municipal policy with which to attach liability to Defendant.

Plaintiff's complaint does not allege that Defendant had an illegal policy under any of the four methods described in *Burgess* and, in his Response to Defendant's Motion for Summary Judgment, the only reference Plaintiff makes to a policy is his stating that "Defendant was taking action based on its municipal policies concerning pre-termination hearings in Plaintiff's case." (ECF No. 18, PageID.816).

However, the record indicates that Defendant's policy regarding pre-termination hearings complied with due process. Plaintiff himself describes Defendant's policy as follows:

31

> [Attorney] Goldsmith's 6/23/21 letter notified Plaintiff that at the 7/13/21 Board meeting "an agenda item of the regular meeting will be to consider the termination" of Plaintiff's employment agreement. (Def. Ex. 31) Goldsmith's letter invited Plaintiff to attend and be represented by counsel. (Id.) Goldsmith further encouraged Plaintiff to attend and participate in the meeting and notified Plaintiff of his rights under the Open Meetings Act. (Id.) [Board Member] Grodi explained that historically the Board would afford an employee the opportunity in closed or open session, at the employee's discretion, to present their case before the Board took action to terminate. (Ex. B 62:23-25, 63:1-11).

(ECF No. 18, PageID.816).

These procedures clearly satisfy *Silberstein*'s requirement of a pre-termination hearing and opportunity to respond discussed above. Since Plaintiff has not identified any other municipal policy, which led directly to the alleged violation of his due process rights, his claim fails under *Monell*.

## B. Age Discrimination Claims

Count II of Plaintiff's Complaint alleges that he was terminated by Defendant because of his age in violation of both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and the Michigan Civil Rights Act ("MCRA"). Defendant seeks summary judgment on these claims. (ECF No. 15, PageID.148). Because Michigan applies federal law to age discrimination claims under the MCRA, the Court analyzes the two claims together. *Featherly v. Teledyne*

*Industries*, 194 Mich. App. 352, 358–59 (1992) ("Michigan courts have considered federal law when reviewing claims of age discrimination based on state law").

Under the ADEA, an employer may not terminate an employee because of that employee's age. 29 U.S.C. § 623(a)(1). A Plaintiff can establish an ADEA violation by presenting either direct or indirect evidence of discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences" and indirect evidence is evidence which "allow[s] a factfinder to draw a reasonable inference that discrimination occurred." *Id*. at 806–07.

For the following reasons, the Court finds that Defendant is entitled to summary judgment on Plaintiff's age discrimination claim proceeding on both indirect and direct evidence theories of discrimination.

### i. Plaintiff failed to establish a claim under the ADEA using indirect evidence of discrimination because Plaintiff was not replaced by someone younger than him.

To state a claim for an ADEA violation using indirect evidence, a plaintiff must satisfy the standard set forth in *McDonnell Douglas v. Green*, (1973) by demonstrating that: "(1) he was a member of the protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a younger person." *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69 (6th Cir. 1982). If a plaintiff sets forth a *prima facie* case of discrimination by satisfying these

elements, the burden shifts to the defendant to put forth a compelling non-discriminatory reason for terminating the plaintiff. *McDonnell Douglas*, 411 U.S. at 802. Defendant contends that Plaintiff cannot satisfy *McDonnell Douglas* because Plaintiff was not replaced by someone younger than him. (ECF No. 15, PageID.149). Defendant also argues that, even if Plaintiff could satisfy *McDonnell Douglas*, Plaintiff's claim would still fail because Defendant had non-discriminatory reasons for terminating Plaintiff. (*Id*).

The parties disagree on who replaced Plaintiff as police chief when he was terminated at age 57. (ECF No. 15-2, PageID.171). An employee is replaced by the person that "was hired to assume [the terminated employee]'s responsibilities. *Willard*, 952 F.3d at 809. Defendant argues that Plaintiff was replaced by interim Police Chief David Meyer while Plaintiff was on medical leave and then, on a permanent basis, by Police Chief Tim Ames when Plaintiff was terminated. (ECF No. 15, PageID.149). Meyer and Ames were 67 and 59, respectively, when they replaced Plaintiff. (ECF No. 15-2, PageID.301, 329). Plaintiff believes he was replaced by Officers Jason Derwoed and Frank Nadeau, both of whom are significantly younger than him. (ECF No. 18, PageID.806).

Since Erie Township maintains only a small police force, the county police chief is a "working chief." In addition to the administrative and supervisory duties

34

of a police chief, a working chief is also required to "[p]erform[] all regular full-time patrol officer duties as necessary" including road patrols, traffic controls, issuing citations, and investigating criminal offenses. (ECF No. 15-3, Duties and Responsibilities of a Police Chief Erie Township, Michigan, PageID.340–41). Plaintiff argues that he was not replaced by interim Chief Meyer because Meyer did administrative duties, "but no patrol work." (ECF No. 18, PageID.805). Instead, Plaintiff contends that he was replaced by Officers Derwoed and Nadeau, since they did the patrol work that a working chief would otherwise be doing. (ECF No. 18-37, Deposition Transcript of Dave Meyer, PageID.1848). The Court disagrees for several reasons.

First, Plaintiff mischaracterizes Meyer's deposition testimony. Meyer did not testify that he did "no patrol work" (ECF No. 18 PageID.805); rather, Meyer stated that, while his focus was administrative work, "if there was a call that they needed [him] on . . . a crime scene or a special investigation" he assisted with that work as well. (ECF No 18-37, PageID.1847). Furthermore, Meyer testified that Plaintiff occupied a similar role before Plaintiff was terminated: "he did his administrative stuff and when he had extra time, he worked the road." (*Id*).

But even if the Court accepts that Plaintiff was not replaced by Meyer because Meyer did not do as much patrol work as Plaintiff; by Plaintiff's same logic, he could

35

not, as he claims, have been replaced by Derwoed and Nadeau. While Derwoed and Nadeau may have taken on Plaintiff's "working chief patrol responsibilities," Plaintiff does not allege that either officer held any of the administrative responsibilities that Plaintiff held when he was employed. (ECF No. 18, PageID.805–06) (internal quotation mark omitted).

Plaintiff's role as police chief was two-pronged. Plaintiff was required to do regular patrol work as well as administrative work. If Meyer did not replace Plaintiff because he did not do enough patrol work; then Derwoed and Nadeau did not replace Plaintiff either, because neither did any administrative work.

Lastly, Plaintiff also fails to address that he was eventually replaced, on a permanent basis, by Tim Ames, who is older than him. (ECF No. 15-2, PageID.329). Plaintiff has presented no evidence to suggest that Ames has not assumed both the patrol and administrative functions that Plaintiff was responsible for since Ames became chief.

For these reasons, the Court finds that Plaintiff was not replaced by a younger employee, so his age discrimination claim proceeding on a theory of indirect evidence fails as a matter of law.

Defendant further argues that even if Plaintiff could show that he was replaced by a younger employee, Plaintiff's claim still fails, because Defendant can articulate

a non-discriminatory reason for terminating Plaintiff in accordance with the *McDonnell Douglas* burden shifting framework. (ECF No. 15, PageID.149). The Court addresses this argument in the following section.

### ii. Defendant had compelling non-discriminatory reasons for terminating Plaintiff.

Plaintiff argues that since Defendant's Motion for Summary Judgment only refers to the *McDonnell Douglas* framework for establishing an age discrimination claim using indirect evidence, Defendant cannot challenge his age discrimination claim proceeding under a direct evidence theory. (ECF No. 18, PageID.804). The Court disagrees.

The Sixth Circuit has held that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence" of discrimination. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *see also LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 379 (6th Cir. 1993) ("[d]irect evidence of discrimination allows a plaintiff to proceed without meeting the requirements of a *prima facie* case set forth in *McDonnell Douglas*") (quoting *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991)). However, even when a plaintiff can bypass the *McDonnell Douglas* requirements by presenting direct evidence of discrimination, the burden "simply shift[s] back to [the defendant] to show that [the plaintiff] was terminated for legitimate nondiscriminatory reasons." *Ang*, 932 F.2d at 549. This is the same

37

burden shifting that exists after a plaintiff has established a *prima facie* case of discrimination under *McDonnell Douglas*. 411 U.S. at 802.

Therefore, while Defendant offers its non-discriminatory reasons for terminating Plaintiff in the context of rebutting Plaintiff's *prima facie* claim of discrimination under an indirect evidence *McDonnell Douglas* theory, the Court will consider these reasons in addressing Plaintiff's direct evidence theory of discrimination as well. (ECF No. 15, PageID.149–50).

First, though, the Court notes that Plaintiff offers no compelling direct evidence of age discrimination. "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Peyton v. Kellermeyer Co.*, 115 F. App'x 825, 828 (6th Cir. 2004) (quoting *Wexler v. White's Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir.2003)). The Sixth Circuit has stated that:

> When examining statements allegedly showing employer bias on the basis of age, courts should consider "whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time" to the challenged action.

*Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153, 158 (6th Cir. 2012) (quoting *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir.1994)).

Plaintiff offers, as direct evidence of age discrimination, eight comments made to or about Plaintiff by Defendant's employees, which reference Plaintiff's age or his retirement:

> 1. Supervisor Frey's 10/1/19 remarks "you're too old for this job" and "all the kids want you gone." (Ex. F);
>
> 2. Current Supervisor Grodi's 1/3/20 remarks "what's wrong old man, the holidays too much for you? You're just too old for this job, taking all these sick days; you're starting to show your age." (Ex. A 59:22-25, 60:1-11);
>
> 3. Supervisor Wilmoth's 2/26/20 remarks, while talking about the problem of younger officers circumventing Plaintiff's authority by going to the Board directly, "you're an old dog in a young dog's fight." Wilmoth's remarks are especially significant because testified that he was Plaintiff's direct supervisor and on 6/8/20 Wilmoth told Plaintiff that he could recommend to the Board that Plaintiff be fired and "the Board would vote with me." (Ex. A 63:2-12, 95:24-25, 96:1-15, Ex. F)[;]
>
> 4. Supervisor Wilmoth's 6/4/20 remark during a disciplinary meeting with Plaintiff "I don't want you to fight you're too old." (Ex. F);
>
> 5. Current Supervisor Grodi's 6/8/20 comment "I don't want you at this point in your career so close to the end to collect your retirement to lose it." (Ex. A 96:22-25, 97:1-10);
>
> 6. Current Supervisor Grodi's 6/8/20 remark "I want you to retire Dean. I want you to get the pension you have earned. There is a tsunami, a wave against you, right now and I think you feel it." (Ex. A 96:22-25: 97:1-10);
>
> 7. Current Supervisor Grodi's 6/17/20 statement to Plaintiff that he had called MERS, which Plaintiff had not asked him to do, and that Plaintiff was eligible to retire "today" if he wanted to. (Ex. A 116:20-25, 117:1-16); and

        8. Defendant attorney Goldsmith's statement to Mullins that if Plaintiff
is approved for a medical retirement he could double his MERS service
time from 10 years to 20 years and that taking this action would prevent
him from seeking employment as a police officer anywhere else. (Ex.
K)

(ECF No. 18, PageID.804).

        These statements do not pass muster under the factors listed in *Blandford*.

First, most of these statements were not made by the decision makers who ultimately

voted to terminate Plaintiff. On July 13, 2021, five board members: Gary Wilmoth,

Cindy Wisbon, Kim Cousino, Steve Mishka, and Paul Perry, voted unanimously to

terminate Plaintiff. (ECF No. 15-12, PageID.766). Therefore statements 1, 2, 5, 6,

and 7, made by Bill Frey and Mike Grodi who were not even at the meeting, and

statement 8, made by Phil Goldsmith, who was at the meeting but had no vote, are

not strong evidence that Plaintiff's age factored into his termination. *Cf. Willard v.

Huntington Ford, Inc.*, 952 F.3d 795, 813 (6th Cir. 2020) (holding that the plaintiff

had made a *prima facie* case of age discrimination because "[a]ll the [discriminatory]

statements were made by [the plaintiff]'s supervisors who participated in the decision

to terminate him").[1]

---

[1] The Court also notes that the plaintiff in *Willard* was, unlike here, replaced by a
younger employee. *Id*. at 804.

Next, while the remaining statements, statements 3 and 4, were made by Gary Wilmoth, who did vote on Plaintiff's termination, these statements were both made well over a year before Plaintiff was terminated and were thus not proximate in time to this decision.

Additionally, Wilmoth's statements are no different and no more probative than the "vague, ambiguous, [and] isolated remarks" Plaintiff repeatedly made about his own age. *Blandford Corp.*, 483 F. App'x at 158. For instance, on May 10, 2019, after being called into a meeting to discuss complaints that had been made about him, Plaintiff said "[y]ou're teaching an old dog new tricks. That's part of the problem." (ECF No. 15-2, PageID.222). Plaintiff has also referred to himself as "old school" (*Id.* at PageID.225), while calling his subordinate officers "millennials." (ECF No. 15-5, PageID.488). Similarly, on June 11, 2020, in a text message to Kim Cousino after his fall and injury, Plaintiff wrote "[i]t's tough getting old." (ECF No. 15-9, PageID.700).

Just as Plaintiff's remarks about his own age were offhand and inconsequential, so too were those few comments made by Mike Grodi. Given this, and given that Plaintiff was replaced, both on an interim and permanent basis, by police officers who are older than him, Plaintiff's direct evidence of age discrimination is unconvincing.

41

In contrast, Defendant offers compelling non-discriminatory reasons for terminating Plaintiff:

> Plaintiff was terminated for his poor performance, including lack of administrative skills, the lack of support from his subordinate police officers, inconsistencies in scheduling of his time and his subordinate officers' times, his shaming of the Township Board during public meetings, and his violation of several Police Department standard operating procedures.

(ECF No. 15-12, Defendant's Answers to Plaintiff's First Interrogatories, PageID.772).

While Plaintiff asserts that these reasons were merely pretextual (ECF No. 18, PageID.807), the record is replete with evidence establishing that Plaintiff was terminated for the non-discriminatory reason that he was an ineffective police chief who routinely violated the department's SOP.

Plaintiff was given warnings about his unprofessional behavior as early as May 2018 (ECF No. 15-4, PageID.366) and Plaintiff began having meetings about his job performance in March 2019. (*Id.* at PageID.369). Officer turnover at the police department was also incredibly high due, in large part, to Plaintiff's inability to communicate professionally or create an effective schedule for the department. (ECF No. 15-2, PageID.232–33; ECF No. 15-7, PageID.673–74).

One of Plaintiff's subordinate officers, Officer Derwoed, voiced his frustration with Plaintiff's management of the police department on several

occasions (ECF No. 15-7, PageID.672) and Officer Derwoed ultimately resigned from the department rather than continue to work with Plaintiff. (ECF No. 15-11, PageID.738).

Defendant even created a new Personnel Committee specifically to handle complaints made against Plaintiff. (ECF No. 15-8, PageID.680). The Personnel Committee, after investigating Plaintiff, later "obeserv[ed] a lack of management and leadership skills" by Plaintiff and stated that "[a] department of two officers and one sergeant should not experience the amount of tension and conflict that ha[d] been brought to the attention of the board recently." (ECF No. 15-8, PageID.687). Mike Grodi, when asked by the Personnel Committee to provide his concerns with Plaintiff's job performance, shared the Personnel Committee's assessment and noted that he too was concerned with Plaintiff's "inability to do the job he was hired to do." (ECF No. 15-9, PageID.694).

Aside from Plaintiff's poor management ability, both Officer Derwoed and Sergeant Meyer independently compiled lists of the multiple ways Plaintiff violated the department's SOP, which he, like all officers, was required to follow. (ECF No. 15-8, PageID.682, 688; ECF No. 15-11, PageID.741). The Personnel Committee later informed Plaintiff about his SOP violations and gave Plaintiff an opportunity to respond to these allegations, which Plaintiff declined. (ECF No. 15-11,

PageID.747–53). Plaintiff was finally terminated pursuant to a vote of the Erie Township Board, per the terms of his at-will contract. (ECF No. 15-12, PageID.768).

In sum, the available evidence clearly establishes that Plaintiff was terminated for his mismanagement of the police department and for his violations of the department's SOP. The few stray comments various Erie Township employees made about Plaintiff's age over the course of a two-year period do not raise a genuine issue of material fact. Therefore, Defendant is entitled to summary judgment in its favor.

## A. Disability Discrimination Claims

In Count III of his Complaint, Plaintiff alleges that Defendant violated both the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 *et seq.* (the "PDCRA"), by failing to accommodate his disability and by terminating him because of it. (ECF No. 1, PageID.14–15). Since Michigan employment discrimination law follows federal law, the Court will consider these two claims together. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629 n.3 (6th Cir. 1998) ("Michigan handicap and employment discrimination law essentially tracks federal law. Generally, resolution of the federal claims will also resolve Plaintiff's [state law] claims").

"To establish an ADA violation, Plaintiff must prove: (1) she has a disability; (2) she is otherwise qualified for her job with or without a reasonable accommodation; and (3) that Defendant either refused to make a reasonable accommodation or made an adverse employment decision because of her disability. *Steward v. DaimlerChrysler Corp.*, 533 F. Supp. 2d 717, 722 (E.D. Mich. 2008) (citing *Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir.1997)).

Plaintiff has not satisfied this third element since his proposed accomodation to work "light duty" was unreasonable, and because he was not terminated because of his disability. Therefore, Plaintiff's ADA claim fails as a matter of law.

### i. Plaintiff cannot prove that Defendant refused to reasonably accommodate him because Plaintiff's proposed accommodation was unreasonable.

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). It is discriminatory to "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the "accommodation would impose an undue hardship on the [employer]." 42 U.S.C. § 12112(b)(5)(a). An individual is qualified if they can "with or without reasonable accommodation…perform the essential functions of the employment position," which they hold. 42 U.S.C. § 12111(8).

Plaintiff bears "the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Steward*, 533 F. Supp. 2d at 722 (quoting *Kleiber v. Honda of America Mfg. Inc*., 485 F.3d 862, 870 (6th Cir. 1998)). "Reasonable accommodations do not force employers to eliminate essential functions, create new jobs, displace existing employees, or violate other employees' rights under a collective bargaining agreement." *Id*. If Plaintiff meets his burden, Defendant then "bears the burden of persuasion on whether a proposed accomodation would impose an undue hardship." *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

Plaintiff's proposed accommodation was that he work "light duty" consisting of administrative and managerial tasks he could perform despite his injury. (ECF No. 15-2, PageID.331). Plaintiff's job description, however, clearly states that his position was that of a working chief, which required him to perform "all regular full-time patrol officer duties as necessary." (ECF No. 15-3, PageID.341). Therefore, Plaintiff's proposed accomodation, that he work as a "light duty" chief, was a proposal for an entirely new position, which is not a reasonable accomodation under Sixth Circuit precedent. *Steward*, 533 F. Supp. 2d at 722 (quoting *Kleiber v. Honda of America Mfg. Inc*., 485 F.3d 862, 870 (6th Cir. 1998)).

46

Despite this, Plaintiff argues that the Court should be persuaded by *Johnson v. City of Pontiac*, 2007 WL 1013247 (E.D. Mich. Mar. 30, 2007) (Hood, J.,), which Plaintiff believes has analogous facts to the present dispute. There, a Pontiac Police Officer was injured while on duty and became permanently disabled from performing active police work. *Id*. at *1. The police department, which is much larger than Erie Township's, rejected his proposed accomodation that he perform light duty work, claiming that it had none available, and that all officers needed to "be able to respond to ensure the safety of the departments and its citizens." *Id*.

Despite the police department's position, though, Judge Hood denied the defendant's motion to dismiss, and held that there remained a factual dispute as to whether any light duty work was available. *Id*. at *6. Judge Hood noted that while "running and making sudden movements are an integral part of being a Pontiac Patrol Officer," the defendant had not established that there was "a consistent policy within the City of Pontiac Police Department that, regardless of position or rank, each officer must be able to perform the basic duties of a Patrol Officer," because the plaintiff presented evidence that some officers in the department had "received accommodations for permanent injuries." *Id*.

This is the key factual distinction that Plaintiff overlooks. While in *Johnson*, the plaintiff successfully refuted the defendant's claim that no light duty work

47

existed by proffering evidence that some officers were offered accommodations; here, Plaintiff has not established that a light duty police chief position existed.

Plaintiff attempts to do so by arguing that interim Chief Meyer, who temporarily replaced Plaintiff after his injury, "did not do the regular full time patrol officer duties" and "Plaintiff could have performed all of the work Meyer described he did as chief under Dr. Brue's restrictions." (ECF No. 18, PageID.812–13). However, while Meyer may not have done regular fulltime patrol work, Meyer testified that the "job of the police chief involve[d] at times being active" and could not "be done by a person sitting behind a desk." (ECF No. 18-39, PageID.1900).  He also testified that "many times" he was out on the road as an active police officer who provided back up to other officers when they needed assistance. (*Id*). Plaintiff, who under Dr. Brue's restrictions, was not permitted to bend, squat, twist, carry more than 10 pounds, or pull for more than 10 minutes an hour, would not have been able to perform these tasks. (ECF No. 15-10, PageID.718).

Since Plaintiff has not shown that any of Defendant's police officers were offered exclusively light duty work and because Plaintiff could not have performed even the limited active police work that interim Chief Meyer performed, Plaintiff's reliance on *Johnson* is misplaced. Furthermore, since Plaintiff's proposed accommodation, to perform only light duty administrative work, was an entirely new

48

position at the police department, this accomodation was unreasonable and Defendant was under no obligation to accommodate it.

## ii. There is no evidence to suggest Plaintiff was fired because of his disability.

Plaintiff also argues that he satisfies the third element of *Steward* because Defendant terminated him due to his disability. (ECF No. 1, PageID.14). The Court disagrees.

Defendant claims to have terminated Plaintiff because of his "poor performance" as police chief as well as his "violation of several Police Department standard operating procedures." (ECF No. 15-12, PageID.772). As discussed in the context of Plaintiff's age discrimination claim, the record is full of compelling evidence illustrating Plaintiff's mismanagement of the police department and his SOP violations, which substantiate Defendant's claim. *See supra* Sections I; IV.B.

And, while in his age discrimination claims, Plaintiff was able to offer, albeit unsuccessfully, the stray comments employees had made about his age as evidence that Defendant's stated reasons for terminating him were pretextual. Here, Plaintiff does not have even stray comments that suggest his termination was in any way related to his disability. Instead, Plaintiff merely asserts, without citing any evidence, that "Defendant's stated reason for Plaintiff's termination was a mere pretext for discrimination." (ECF No. 18, PageID.812).

49

Considering the compelling evidence that Defendant terminated Plaintiff for non-pretextual, non-discriminatory reasons, Plaintiff's conclusory assertions of disability discrimination do not create a genuine issue of material fact. Therefore, Plaintiff's ADA claim must be dismissed.

## B. Workers' Compensation Retaliation Claim

Count IV of Plaintiff's Complaint alleges that he was terminated in retaliation for filing a workers' disability compensation claim following his injury, in violation of the Michigan Workers' Disability Compensation Act (the "WDCA"). (ECF No. 1, PageID.15). The WDCA makes it unlawful for an employer to:

> [D]ischarge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

M.C.L. § 418.301(13).

Michigan courts apply the *McDonnell Douglas* burden-shifting framework to claims of unlawful retaliation under the WDCA. *Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 359 (6th Cir. 2014). The plaintiff bears the burden of "demonstrat[ing] that the filing of a workers' compensation claim was a significant factor" in his termination. *Dortman v. ACO Hardware, Inc.*, 405 F. Supp. 2d 812, 824 (E.D. Mich. 2005) (citing *Taylor v. General Motors Corp.*, 826 F.2d 452, 456

(6th Cir.1987)) (internal quotation marks omitted). The plaintiff cannot meet this burden "through offers of speculation and conjecture." *Id* (citing *Kirkland v. Diecast Corp.*, 1998 WL 2016629 (Mich. App. 1998).

Plaintiff erroneously relies on the Michigan Court of Appeal's decision in *Cuddington v. United Health Servs., Inc.*, 298 Mich. App. 264, 271 (2012), to suggest that he met his burden here. (ECF No. 18, PageID.813). Plaintiff states that in *Cuddington*:

> [T]he [c]ourt held that plaintiff had presented sufficient evidence in support of his WDCA retaliation claim under MCL §418.301(13) since he was terminated after suffering a work-related injury and expressing his need for medical services which was a right afforded him under the WDC[]A.

(ECF No. 18, PageID.813). Plaintiff appears to be arguing that since he was also terminated after suffering a work-related injury and seeking medical services for that injury, he too has met his burden under the WDCA.

Plaintiff has omitted crucial facts that distinguish the plaintiff in *Cuddington*'s termination from his own. There, the plaintiff injured his back and neck after crashing into another vehicle on an icy road. *Cuddington*, 298 Mich. App. at 268. The next day, when the plaintiff told his employer he was not at work because he needed to see a doctor, the employer responded: "[Y]ou ain't hurt, if you were hurt

51

you would have went in the ambulance to the hospital last night. If you don't come into work, you are blanking—blanking fired." *Id*.

Had Plaintiff faced similar animosity when he told Defendant about his injury, the Court may have found *Cuddington* to be analogous, but Plaintiff did not. When Plaintiff texted Kim Cousino the day after his injury to let her know that he would need to take a few days off to recuperate Cousino replied, "[o]k, I hope it starts to feel better soon! Thanks for letting me know. Have a good weekend." (ECF No. 15-9, PageID.701).

Plaintiff also faced no animosity when he submitted his benefits claim. Plaintiff even admitted that Defendant filled out the necessary paperwork to allow Plaintiff's benefits claim to be processed with the insurance company properly and without incident. (ECF No. 15-2, PageID.270–71).

Furthermore, contrary to *Cuddington*, where the plaintiff was terminated two days after injuring himself and one day after seeking medical treatment (*Cuddington*, 298 Mich. App. at 268–69); here, Plaintiff was terminated more than a year after he submitted his benefits claim. (ECF No. 15-9, PageID.705). This gap in time suggests a lack of causation.

This lack of causation is especially apparent because Plaintiff received his workers' compensation benefits until February 2, 2021, but was not fired until July

17, 2021. (ECF No. 15-2, PageID.298). If Defendant wished to retaliate against Plaintiff for filing a benefits claim, Defendant would not have allowed Plaintiff to receive those benefits for a year and then wait an additional five months after the benefits had stopped, to terminate him.

Plaintiff provides no evidence that his benefits claim was a significant factor in his termination beyond his flawed reliance on *Cuddington*. In contrast, the evidence that Defendant terminated Plaintiff because of his deficient job performance is far more compelling. The Court has provided a full account of Plaintiff's inability to run the police department in the factual background section and in the context of Plaintiff's age discrimination claim. The Court will not duplicate it here. *See supra* Sections I; IV.B.

Since Plaintiff has not met his burden of providing evidence that he was terminated in retaliation for making a workers' compensation claim, and since Defendant had ample legitimate, non-retaliatory reasons for terminating Plaintiff, Defendant is entitled to summary judgment on this claim.

## V. CONCLUSION

Plaintiff was an at-will employee who had no property interest in his continued employment. Defendant did not violate Plaintiff's due process rights by terminating him.

Furthermore, after reviewing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court concludes that there is no genuine issue of material fact as to whether Plaintiff was terminated based on: (1) his age, (2) his disability, or (3) in retaliation for filing a workers' compensation claim.

The evidence establishes only that Defendant terminated Plaintiff because of Plaintiff's inability to manage the police department, its staff, and their schedules, and because of his repeated violations of the department's Standard Operating Procedures.

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED** on all four counts of Plaintiff's Complaint. Plaintiff's Complaint is **DISMISSED WITH PREJUDICE** in its entirety.

SO ORDERED.


Dated: December 14, 2023                    s/Paul D. Borman
                                            Paul D. Borman
                                            United States District Judge